[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14370

_____

D.C. Docket No. 1:16-cr-20836-PCH-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BERNARD MOORE,
DERRICK MILLER,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 31, 2020)

Before ROSENBAUM and TJOFLAT, Circuit Judges, and PAULEY.[*]

PAULEY, District Judge:

Appellants Bernard Moore and Derrick Miller (together, "Appellants") appeal their convictions for narcotics trafficking and firearms possession. Appellants argue, among other things, that: (1) the district court erred in allowing them to be shackled during trial; (2) the district court mishandled a jury note; and (3) their 18 U.S.C § 922(g) convictions should be vacated under *Rehaif v. United States*, 139 S. Ct. 2191 (2019). After careful review of the record and briefs, and with the benefit of oral argument, we affirm Appellants' convictions and sentences.[1]

## I. BACKGROUND

The Drug Enforcement Agency ("DEA") and Federal Bureau of Investigation ("FBI") investigated Michael Fonseca and Michael Lewis for suspected narcotics trafficking in an effort to identify their supplier. The investigation focused on an apartment in Miami, Florida that law enforcement believed was a stash house (the "Stash House.") On December 2, 2015, a confidential informant conducted a controlled buy. The confidential informant met Fonseca in his car. After telling the confidential informant that he would retrieve the heroin "from my dog," Fonseca went to the Stash House, where he met Miller, and both went inside. When they

---

[*] Honorable William H. Pauley III, Senior United States District Judge for the Southern District of New York, sitting by designation.

[1] We have considered the other arguments raised by Appellants and find them meritless.

emerged from the Stash House, Fonseca returned to the confidential informant's car and handed him a heroin sample. Law enforcement recorded the conversations between Fonseca and the confidential informant, and, using surveillance footage later recovered from the Stash House, was able to determine that Fonseca had subsequently walked to the Stash House before returning to the confidential informant's car to conduct the transaction.

On January 8, 2016, DEA agents observed Moore escorting Lewis into the Stash House and then saw Lewis leave holding what appeared to be a bag. When DEA agents stopped and searched Lewis's vehicle, they recovered heroin from two bags on the vehicle's floor.

On January 10, 2016, DEA agents executed a search warrant on the Stash House. Once inside, DEA agents discovered a security camera system recording Appellants' comings and goings. Fortuitously for law enforcement, Appellants preserved the surveillance footage depicting them entering and leaving the Stash House, locking and unlocking the door, carrying firearms, and patrolling the perimeter. The surveillance footage showed Appellants inside the Stash House the day before the search. Law enforcement recovered large amounts of narcotics, including marijuana, hydrocodone, ethylone, heroin, powder cocaine, and crack cocaine, as well as narcotics paraphernalia. During the search, DEA agents also seized Miller's identification cards and a loaded .357 caliber pistol with Moore's

DNA on the trigger. Additionally, DEA agents recovered two firearms from vehicles parked outside the Stash House: a .45 caliber pistol similar to one depicted on surveillance footage of Miller on January 6, 2016 and a 9mm pistol with Miller's fingerprints on its magazine.

On November 2, 2016, Appellants were arrested. Law enforcement searched Miller's residence and discovered narcotics, drug paraphernalia, and a firearm.

The government charged Appellants with conspiracy to distribute a controlled substance from December 2, 2015 through January 10, 2016 in violation of 21 U.S.C. § 846 (Count 1); possession with the intent to distribute a controlled substance on January 10, 2016 in violation of 21 U.S.C. § 841(a)(1) (Count 3); being felons in possession of firearms on January 10, 2016 in violation of 18 U.S.C. § 922(g) (Count 4); and possession of firearms in furtherance of drug trafficking on January 10, 2016 in violation of 18 U.S.C. § 924(c) (Count 5). The government also charged Moore with possession with intent to distribute a controlled substance on November 2, 2016 in violation of 21 U.S.C. § 841(a)(1) (Count 8). Finally, the government charged Miller with possession with intent to distribute a controlled substance on December 2, 2015 in violation of 21 U.S.C. § 841(a)(1) (Count 2); possession with intent to distribute a controlled substance on November 2, 2016 in violation of 21 U.S.C. § 841(a)(1) (Count 6); and being a felon in possession of a firearm on November 2, 2016 in violation of 18 U.S.C. § 922(g) (Count 7).

4

Prior to trial, Appellants stipulated that they had prior felony convictions. During trial, Appellants were shackled. The trial record is bereft of any explanation for this security measure. In fact, the only reference to shackling at trial occurred when Miller asked permission to examine a witness himself and, outside the jury's presence, the district court acknowledged a logistical issue because he was shackled. The district court resolved the matter by permitting Miller to question the witness while seated at counsel table with the assistance of his attorney.

During their deliberations, the jury sent a number of notes seeking guidance from the district court. Jury Note No. 6 on the second day of deliberations posed the following request:

> Honorable J. Huck,
> Various members of the jury would like to speak with you directly about their safety upon the conclusion of the trial. Can we have a couple of minutes to discuss this with you?

In response to that jury note, Miller's counsel moved for a mistrial, which the district court denied. The government proposed that the district court advise the jurors that there was no danger and that they should resume their deliberations. Appellants' counsel requested that the district court interview each juror who expressed safety concerns.

After conferring with counsel, the district court spoke with the jury foreperson:

5

THE COURT:  I got your note.  I've conferred with counsel.  I would be more than happy to discuss this issue with any juror who feels that it would be appropriate to discuss it with me on a one-on-one basis.  Bring them into the courtroom, and we will discuss it with them.  And then we will proceed accordingly and see what comes out.

So if I can have those people—just go back and say, whoever wants to come out and have that discussion, it will be just the judge and the court reporter, and the court security officer of course.

A JUROR:  Thank you, Your Honor.

Thereafter, the district court engaged in the following colloquy with a juror *in camera*:

THE COURT:  All right.  You indicated that you wanted to speak to the Judge?

A JUROR:  Yes.

THE COURT:  What do you want to speak to me about?

A JUROR:  Because I am afraid.  I don't know if I have to put my name on some paper or something like that if I—no?  If the decision is not guilty—

THE COURT:  I'm sorry?

A JUROR:  —I'm afraid of that.  I mean guilty, sorry.

THE COURT: Okay. So have you—is there any incident or has anybody said anything to you or is there anything that's happened outside of this courtroom that gives you—

A JUROR:  No, no, I'm afraid because if the decision is guilty, I don't know if the family of the—

THE COURT:  Okay.  I understand.  I think I understand your concern.  But has there been any threat or any indication by some sign or some gesture or anything of that nature or anything outside of this courtroom that was said to

6

you or you did that would suggest that you have these feelings or cause you to have these feelings?

A JUROR:  No, no, no, no, no.  I just want to know if I don't have to put my name on anything.

THE COURT:  No.

The district court thanked the juror and asked the court security officer to inquire whether any other juror wished to speak with the court.  A second juror came forward and the following *in camera* colloquy ensued:

THE COURT:  And your foreperson has indicated that you want to talk to the Court, to the Judge.

A JUROR:  Yeah, just was—

THE COURT:  Sit down, relax, just take it easy.

A PROSPECTIVE[2] JUROR:  Just was concerned how the process goes when we would leave the courthouse.  Are we leaving at the same time as family members are leaving?  Are our names documented on the transcripts where someone could obtain them?

THE COURT:  You are concerned about after the case is finished?

A JUROR:  Yeah.

THE COURT:  We can help you with that.  That shouldn't be an issue.  That's your concern?

THE COURT:  Has there been anything specific that was said to you or any threat made to you or any gesture made to you or anything done in this courtroom that caused your specific concern?

---

[2]    While the transcript identifies this juror as "prospective juror," this appears to be a typographical error.

A JUROR:  No.

THE COURT:  And have you done anything outside this courtroom that caused you any specific concern?

A JUROR: No, but just how my mind works is a little bit—

THE COURT:  Okay.  Fair enough.

A PROSPECTIVE JUROR:  I'm my own enemy.

THE COURT:  We are all that way.

A JUROR:  I confuse myself.  You know, things are just crazy in this world and you don't know.

THE COURT:  That concern about leaving at the same time, we can certainly take care of that very easily.

A JUROR:  That's what everyone else said, so I think we will be fine after that.  Thank you so much.

THE COURT:  Will you see if there's anybody else in there.

A JUROR:  No, I spoke for everyone.

THE COURT:  Just ask them.  If there is anybody else who wants to speak to me, I will be glad to do so.

A PROSPECTIVE JUROR:  Thank you.

No other jurors came forward to speak with the district court.   The district court then summarized the two *in camera* juror interviews for counsel and the parties:

THE COURT:  Anyway, I had the interview.  There were two jurors.  I will give you my impression.  It's not as big an issue or deal as, frankly, I was concerned about.  One expressed an issue about leaving the courthouse after

8

a verdict. The other was concerned about did she have to write—sign something or—I didn't ask her specifically, but I assume she was talking about signing the verdict. She's not the foreperson. I asked them if there was anything that happened in this courtroom that would suggest there a threat, anything said to them either in or outside of the courthouse, any gesture made to them. They all have denied that. I said was there anything outside the courtroom that caused you any concern. They all denied that. It was, I wouldn't say quite a nonevent, but it was about as close to being a nonevent as one would hope would be the case.

That's my report to you. I would suggest that we proceed this way, that we give them an instruction and make it an instruction similar to the one that was given in May Collins case using the exact same language except I would add some language stating the Court is further instructing them so that it becomes a little more definitive.

Thereafter, Appellants moved to strike those two jurors. The district court denied their motion and counsel then agreed on the following response to Jury Note No. 6:

The Court and the parties agree that there is no reason for any concern about the safety of any juror in this case. Therefore the Court further instructs that you should continue to deliberate on the issues before you and should not let any such concerns be part of your consideration in your further deliberations.

Later that day, the jury returned a verdict. The jury convicted both Appellants on Counts 1, 3, 4, and 5, and Miller on Count 6. However, the jury acquitted Moore on Count 8 and Miller on Counts 2 and 7.

The district court sentenced Moore principally to 240 months of imprisonment and Miller principally to 142 months of imprisonment.

## II. DISCUSSION

A.    **Shackling**

9

Appellants argue that the district court erred in shackling them during trial. Indeed, Appellants assert that the district court's failure to conduct any hearing on the record to determine whether that security measure was necessary constitutes reversible error. We disagree.

We typically review a shackling determination for abuse of discretion. *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 821 (2006). However, since Appellants did not raise this issue with the district court, we review for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also United States v. Davis*, 754 F.3d 278, 283 (5th Cir. 2014) ("Because Davis did not object during the bench trial to the requirement that he stand trial handcuffed and shackled, our review is limited to plain error."). Under the plain error standard, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Baker*, 432 F.3d at 1203 (citation omitted).

In *Deck v. Missouri*, the Supreme Court held that the routine shackling of defendants during a criminal trial, absent "the presence of a special need," was unconstitutional. 544 U.S. 622, 626 (2005). The Supreme Court reasoned that shackling can (1) affect the presumption of innocence, (2) infringe on defendants'

10

ability to communicate with their lawyers and participate in their defense, and (3) impugn the dignity of the judicial process. *Id.* at 630–32. However, the Supreme Court noted that in some circumstances, "these perils of shackling are unavoidable." *Id.* at 632. At times, district courts oversee trials of dangerous defendants who pose risks in courtrooms. Accordingly, the constitutional due process requirement "is not absolute" and "permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." *Id.* at 633. The Supreme Court recognized "the important need to protect the courtroom and its occupants" and emphasized that "any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial." *Id.*

Here, no such particularized determination of the security needs was memorialized on the record. In fact, the trial transcript contains no reference to shackling aside from the colloquy concerning Miller's request to examine a witness. Typically, a "district court is required to place the reasons for its decision to use such measures on the record" so that a reviewing court can properly evaluate whether such measures were appropriate. *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir. 2002). Here, the record offers no guidance regarding the decision to employ physical restraints.

11

*Deck* announced that, "given their prejudicial effect, due process does not permit the use of *visible restraints* if the trial court has not taken account of the circumstances of the particular case." *Deck*, 544 U.S. at 632 (emphasis added). It is unclear if *Deck* mandates a hearing in order for a district court to employ nonvisible restraints. However, Appellants could not survive plain error review regardless of whether *Deck* applies. Accordingly, we need not reach that question.

Any error here—if it exists—would not warrant reversal. To survive plain error review, "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings." *Puckett*, 556 U.S. at 135 (quotation marks omitted). With respect to the first concern laid out by the Supreme Court in *Deck*, there is no indication in the record that the jury was aware of the shackles. Moreover, the jury reached a split verdict, acquitting each of the Appellants of at least one charge—an unlikely outcome had the presumption of innocence been undermined before the verdict. Regarding the second *Deck* consideration, the record indicates that Appellants' ability to participate in the trial was not affected. Indeed, Miller examined a witness. As to the third *Deck* concern, we do not see how shackling in this case impacted the dignity of the judicial process. Shackling is permitted—albeit

usually with analysis on the record as to why physical restraints are necessary. Accordingly, the district court did not plainly err in shackling Appellants.[3]

We admonish district courts, though, that in the typical case, the record should reflect why restraints are necessary. These security measures should not be the norm, and it is not overly burdensome to articulate why they are needed. Moreover, a defendant would be hard-pressed to argue error, plain or otherwise, if he or she failed to lodge an objection to the judge's stated justification. *Cf. Puckett*, 556 U.S. 129 at 134 ("[T]he contemporaneous-objection rule prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.") (citations omitted).

## B.    The Jury Note

Appellants contend that the district court mishandled the jury note. With the benefit of the trial transcript, Appellants assert that the district court cut off the first juror as that juror was attempting to articulate certain concerns. Next, Appellants argue that the district court provided counsel with a misleading summary of the *in camera* juror interviews. Finally, Appellants maintain that the district court erred in failing to conduct a *Remmer* hearing. We disagree with each of these contentions.

---

[3]    Moreover, in circumstances such as these, if defendants object during trial, the district court can rule on their objection and set forth its reasoning. But by staying silent, defendants deprive the district court of the ability to address any concern, had they objected at trial. Defendants should be encouraged to lodge objections in the district court, thereby clarifying issues for a reviewing court.

13

We review a district court's decisions regarding juror misconduct for abuse of discretion. *United States v. Sammour*, 816 F.3d 1328, 1336 (11th Cir. 2016). Appellants contend that the district court interrupted the first juror, preventing that juror from fully explaining his or her concern. However, the juror clearly articulated a concern about names appearing on the verdict form. The district court responded directly to that concern, assuring the juror that his or her name would not appear on the verdict sheet. The juror raised nothing further. Every indication from the transcript is that the district court and the juror were engaged in conversation and may have simply been talking over each other; often, a challenging colloquy for a court reporter to capture.

Further, there is no evidence that the jurors' personal safety concerns affected their impartiality. Ultimately, the jury reached a split verdict. By convicting Appellants on some counts and acquitting on others, the jury carefully examined the evidence and reached an impartial verdict. *See Skilling v. United States*, 561 U.S. 358, 395 (2010) (noting that a split verdict suggested the jury was not infected by outside influence); *United States v. Dominguez*, 226 F.3d 1235, 1248 (11th Cir. 2000) ("The careful weighing of evidence inherent in a split verdict makes the verdict itself evidence that the jury reached a reasoned conclusion free of undue influence and did not decide the case before the close of evidence." (quotation marks omitted)).

14

Appellants also take issue with how the district court summarized its juror interviews. They contend that the district court failed to advise counsel that the concerns expressed by two jurors permeated the entire jury. However, the district court's incomplete summary was harmless. Having lodged an objection, Miller's trial counsel preserved the issue for appeal. We have the benefit of reviewing the transcript of the juror interviews, an opportunity not afforded to Miller's counsel at trial. That transcript does not alter our analysis or add value to Miller's objection at trial.

Appellants contend that had trial counsel been armed with this information, he would have moved for every juror to be questioned individually. But the district court would not have been under any obligation to conduct such an inquiry. Indeed, interacting with jurors during deliberations is a core discretionary function for trial judges and should be exercised with great care. Had the district court inquired further, it "could have backfired by raising concerns in the minds of the jurors that were not there before." *Sammour*, 816 F.3d at 1339. Given the unjustified nature of the jurors' fears, it would not have been prudent for the district court to lend credibility to those concerns by questioning each juror.

Nevertheless, because the district court acknowledged that it "had never encountered" a similar situation with a deliberating jury, we believe it would be helpful to provide guidance to district courts on interviewing jurors *in camera*. The

15

best course of action largely follows the procedure the district court employed here. When learning that one or more jurors in a criminal trial have security concerns, the district court should confer with counsel to discuss the contours of an *in camera* interview. After a district court speaks with a juror *in camera*, it is entirely appropriate to summarize its assessment of the interview on the record for the benefit of the parties. Such a summary can often tell the parties more than a transcript because the judge can describe the affect of the juror, as the district court did here when he noted that the situation "was about as close to being a nonevent as one would hope would be the case." However, to avoid the kind of skirmish presented on this appeal, the district court can also share the transcript of the *in camera* interview with the parties. That can be done by having the court reporter read it back to counsel. *See, e.g.*, *United States v. Watchmaker*, 761 F.2d 1459, 1464 (11th Cir. 1985) ("A transcript of the conversation was prepared and was distributed to all parties after the meeting."). Finally, the district court can confer with counsel and deal with any additional applications they may wish to make.

Appellants also contend that the district court erred in not holding a *Remmer* hearing to examine each of the jurors. Due process "entitles a defendant to a hearing in the trial court to ascertain actual prejudice following an allegation of extrinsic contacts with the jury." *Crowe v. Hall*, 490 F.3d 840, 847 (11th Cir. 2007) (citing *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

16

Appellants misconstrue the standard for a *Remmer* hearing. A district court must conduct a *Remmer* hearing when there is evidence of *outside* influence. *See Watchmaker*, 761 F.2d at 1465 ("[T]he failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources."). Here, there was no such evidence. The district court inquired—and both jurors affirmed—that there were no outside influences propelling their concerns. Therefore, the district court did not abuse its discretion in addressing the jury note and declining to conduct a *Remmer* hearing.

**C.    *Rehaif v. United States***

In June 2019, after the parties fully briefed this appeal, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). There, the Supreme Court clarified that, "in a prosecution under [18 U.S.C.] § 922(g) and [18 U.S.C.] § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id.* at 2200.

In response to this intervening authority, the parties filed supplemental briefs. Appellants invoke *Rehaif* to challenge both the district court's subject matter jurisdiction and the merits. We address both in turn, beginning with the threshold issue of jurisdiction.

17

### a. Jurisdictional Defect

Appellants—in an attempt to avoid the plain error standard—argue that because their indictments failed to allege their knowledge of their felon status, the indictment failed to allege a crime, depriving the district court of jurisdiction. We disagree.

Federal courts are courts of limited jurisdiction, imbued with the authority to hear cases and controversies as prescribed by the Constitution or federal statute. *See* U.S. Const. art. III, § 2; *see also United States v. Hudson*, 11 U.S. 32, 33 (1812) ("All other Courts created by the general Government possess no jurisdiction but what is given them by the power that creates them, and can be vested with none but what the power ceded to the general Government will authorize them to confer."). Congress has conferred jurisdiction over federal criminal prosecutions to the district courts. 18 U.S.C. § 3231.

There is no dispute that the indictment failed to allege a now-requisite mens rea element of 28 U.S.C. § 922(g). However, Appellants conflate the lack of subject matter jurisdiction with the failure to allege a crime. The standard for whether an indictment sufficiently alleges a crime is not demanding. An indictment tracking the statutory language and stating approximately the time and place of an alleged crime is sufficient. *See United States v. Brown*, 752 F.3d 1344, 1353 (11th Cir. 2014).

18

Here, the indictment plainly meets that standard.  The indictment stated, in pertinent part:

> On or about January 10, 2016, in Miami-Dade County, in the Southern District of Florida, the defendants, DERRICK MILLER and BERNARD MOORE, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm and ammunition in and affecting interstate and foreign commerce, in violation of Title l8, United States Code, Section 922(g)(1).

The indictment further identified the specific firearms and corresponding ammunition Appellants possessed.  This tracks—and cites—the language from 18 U.S.C. § 922(g)(1), which states: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition."

This indictment was clearly sufficient prior to *Rehaif*.  While the indictment does not allege that Appellants were aware of their status as felons at the time they possessed the firearms, the text of 18 U.S.C. § 922(g) contains no such requirement.  In *Rehaif*, the Supreme Court interpreted the statutory language of 18 U.S.C. § 922(g) as requiring a defendant to have knowledge of his status.  Reading this knowledge requirement into the statute while also holding that indictments tracking the statute's text are insufficient would be incongruous.  Although the government may be well advised to include such mens rea allegations in future indictments, that language is not required to establish jurisdiction.

19

Because there are occasions when defects in an indictment affect subject matter jurisdiction, it is worth delving into the distinction. Supreme Court precedent focuses on whether the indictment alleges "offenses against the laws of the United States." *United States v. Williams*, 341 U.S. 58, 65, (1951). The absence of an element of an offense in an indictment is not tantamount to failing to charge a criminal offense against the United States. However, if the charged conduct itself is not criminal, then an offense against the United States has not been pled and the district court lacks subject matter jurisdiction.

The Supreme Court has provided guidance to lower courts regarding when defects in an indictment touch subject matter jurisdiction. Indeed, *Rehaif* is not the first time the Supreme Court has read additional requirements into a statute while an appeal was pending and subsequent jurisdictional challenges arose. In *United States v. Cotton*, the district court imposed a sentencing enhancement based on drug quantity. 535 U.S. 625, 628 (2002). While defendants' appeal was pending, the Supreme Court ruled that a jury must determine the amount of drugs at issue beyond a reasonable doubt in order for a district court to apply the sentencing enhancement. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Because there was no such requirement prior to the announcement of the new rule laid out by *Apprendi*, neither the district court nor the government in *Cotton* asked the jury to make such a finding. Defendants argued that under *Ex parte Bain*, 121 U.S. 1 (1887), a defective

indictment stripped the court of jurisdiction.  The Supreme Court explicitly rejected this argument, holding that the omission of an element does not affect jurisdiction. *Cotton*, 535 U.S. at 631 ("Insofar as it held that a defective indictment deprives a court of jurisdiction, *Bain* is overruled.").  The Supreme Court relied on precedents holding that indictment defects do not implicate jurisdiction.  *See, e.g.*, *Williams*, 341 U.S. at 65 (holding the fact that "the indictment is defective does not affect the jurisdiction of the trial court to determine the case presented by the indictment."); *Lamar v. United States*, 240 U.S. 60, 65 (1916) ("The objection that the indictment does not charge a crime against the United States goes only to the merits of the case.").

The Supreme Court further commented on the tension between the "concept of subject-matter jurisdiction . . . [which] can never be forfeited or waived" and the notion that "the grand jury right can be waived."  *Cotton*, 535 U.S. at 630.  Since indictment can be waived, it follows that a defect in an indictment cannot destroy subject matter jurisdiction.  As such, the Supreme Court held that the omission of the quantity of narcotics did not deprive the district court of jurisdiction.  *Id.* at 631.

We have previously considered the question of whether element omissions in an indictment create jurisdictional defects, in the context of guilty pleas where defendants waived non-jurisdictional challenges.  While Appellants did not plead guilty, our decisions arising out of guilty pleas are instructive.  In *United States v.*

*Brown*, the defendant was indicted for one count of receiving counterfeit money orders under 18 U.S.C. § 473 and one count of knowingly importing counterfeit money orders under 18 U.S.C. § 545.  752 F.3d at 1346.  While the second count of the indictment included a charge of knowingly violating the statute, the first did not—despite well-established precedent requiring knowledge.  Brown pled guilty to the first count but not the second.  Later, she challenged her conviction and sentence on the ground that the district court lacked jurisdiction because the indictment did not state a federal crime.  *Id.* at 1347.  In rejecting defendant's argument, this Court differentiated between instances when defects in indictments strip a court of jurisdiction and when they do not.

The lynchpin for a defect that implicates jurisdiction is "whether the indictment charged the defendant with a criminal 'offense[ ] against the laws of the United States.'"  *Id.* at 1353 (alteration in original) (quoting 18 U.S.C. § 3231).  We noted that an indictment fails this test where: "(1) a crime . . . simply did not exist in the United States Code; (2) [the] conduct . . . undoubtedly fell outside the sweep of the . . . statute; and (3) a violation of a regulation that was not intended to be a 'law' for purposes of criminal liability."  *Id.* (citations omitted).  In other words, when the indictment itself fails to charge a crime, the district court lacks jurisdiction.  However, while "[t]he omission of an element may render the indictment insufficient, . . . it does not strip the district court of jurisdiction over the case."  *Id.*

at 1353–54. "So long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges an 'offense against the laws of the United States' and, thereby, invokes the district court's subject-matter jurisdiction." *Id.* at 1354. Since the indictment merely omitted the element, we ruled that the district court had jurisdiction.

In *Alikhani v. United States*, the defendant pled guilty to an indictment charging him with violating executive orders and regulations forbidding exports to and certain transactions with select foreign nations. 200 F.3d 732, 733 (11th Cir. 2000). Later, Alikhani challenged his plea, arguing that the indictment failed to allege he was a U.S. person, as required by the applicable executive orders and regulations. *Id.* at 734. Since Alikhani's guilty plea siloed him to jurisdictional challenges, he asserted this defect meant the district court did not have jurisdiction. *Id.* But we rejected that argument and held that the indictment's alleged defects, "even if meritorious, would not implicate the district court's subject-matter jurisdiction." *Id.*

We reasoned that "[s]ubject-matter jurisdiction defines the court's authority to hear a given type of case." *Id.* (quotation marks omitted). Since "Congress has provided the district courts with jurisdiction . . . of all offenses against the laws of the United States," and the "indictment charg[ed] Alikhani with violating laws of the United States," the district court was empowered to hear the case. *Id.* at 734–35

23

(quotation marks omitted). Indeed, this Court contemplated that since the district court had jurisdiction, it could "enter judgment upon the merits of the indictment, such as dismissing the indictment on the ground that it does not allege facts showing that the defendant committed the charged offense." *Id.* at 735.

This Court has also dealt with similar jurisdictional challenges following *Apprendi*. *See United States v. Sanchez*, 269 F.3d 1250 (11th Cir. 2001) (en banc), *abrogated on other grounds by United States v. Duncan*, 400 F.3d 1297 (11th Cir. 2005); *United States v. Cromartie*, 267 F.3d 1293 (11th Cir. 2001); *McCoy v. United States*, 266 F.3d 1245 (11th Cir. 2001). While these decisions predate *Cotton*, their reasoning is parallel. In *Sanchez*, we held that "[a] jurisdictional defect occurs only where a federal court lacks power to adjudicate at all." 269 F.3d at 1273. To determine whether the federal court has the power to adjudicate, this Court differentiated between indictments that omitted elements and indictments "where a defect . . . results in the indictment charging no crime at all." *McCoy*, 266 F.3d at 1253.

We explained that jurisdiction cannot be waived, "as parties cannot confer subject matter jurisdiction on federal courts by consent." *Sanchez*, 269 F.3d at 1274. Since Federal Rule of Criminal Procedure 7(b) allows for a defendant to waive prosecution by indictment, defects in the indictment "do not go to the district court's

24

subject matter jurisdiction." *Id.* at 1273–74. Identical reasoning supports both our *McCoy* and *Cromartie* decisions.

Opinions finding that defects in indictments do not implicate jurisdiction are useful given the factual similarities to this case. Equally instructive are opinions where we concluded the converse—that a defective pleading affected jurisdiction.

For example, in *United States v. Peter*, the defendant pled guilty to a single count of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act. 310 F.3d 709, 711 (11th Cir. 2002). Peter admitted to misrepresenting license applications he mailed to the Florida Division of Alcoholic Beverages and Tobacco, which constituted mail fraud under 18 U.S.C. § 1341. *Id.* After his plea, the Supreme Court decided *Cleveland v. United States*, where it held that "[s]tate and municipal licenses in general . . . do not rank as 'property,' for purposes of § 1341." 531 U.S. 12, 15 (2000). Accordingly, "the facts to which Peter pled guilty did not constitute a crime under *Cleveland*." *Peter*, 310 F.3d at 711.

We distinguished *Peter* from *Cotton* and our post-*Apprendi* line of cases, "because [the indictment] charged no crime at all." *Id.* at 714 (quotation marks omitted). We noted that "it is clear under these circumstances that the Government's proof of the alleged conduct, no matter how overwhelming, would have brought it no closer to showing the crime charged than would have no proof at all." *Id.* at 715. Further, "Peter's innocence of the charged offense appears from the very allegations

made in the superseding information, not from the omission of an allegation requisite to liability." *Id.*

Appellants are also not the first to characterize their *Rehaif* challenges as jurisdictional. In *United States v. Balde*, Balde pled guilty to possessing a firearm as an illegal alien in the United States. 943 F.3d 73, 79 (2d Cir. 2019). Days after the Second Circuit affirmed his conviction and sentence, the Supreme Court decided *Rehaif*. Like Appellants here, Balde filed supplemental briefing challenging the jurisdiction and merits of his 18 U.S.C. § 922(g) conviction.

The Second Circuit rejected Balde's jurisdictional argument. The court reasoned that *Rehaif*'s knowledge requirement "is best understood as telling us what conduct [the statute] prohibits and how the statute would be violated, which is ultimately a merits question and not one that affects the jurisdiction of the court to adjudicate the case." *Id.* at 90 (quotation marks omitted) (alteration in original). Further, the indictment in *Balde* "closely tracks the language of the statute while including specific allegations as to the time, place and nature of Balde's conduct that is alleged to constitute a violation of [18 U.S.C.] § 922(g)(5)(A)." *Id.* at 89.

Ultimately, the law is clear: the omission of an element in an indictment does not deprive the district court of subject matter jurisdiction. A defective indictment only affects jurisdiction when it fails to allege an offense against the United States. So long as the conduct described in the indictment is a criminal offense, the mere

26

omission of an element does not vitiate jurisdiction. This principle is buttressed by the fact that defendants can waive their right to indictment by a grand jury and proceed on an information of the government. Fed. R. Crim. P. 7(b). In contrast, subject matter jurisdiction can *never* be waived, and a court can raise that issue *sua sponte* at any time. *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("Unlike most arguments, challenges to subject-matter jurisdiction may be raised by the defendant at any point in the litigation, and courts must consider them *sua sponte*." (quotation marks omitted)).

The post-*Apprendi* line of cases is analogous. While *Apprendi* dealt with sentencing enhancements rather than the conviction itself, the underlying facts supporting the enhancement—or in this case, the elements in a criminal offense— must be alleged in the indictment and proved beyond a reasonable doubt. *See Brown*, 752 F.3d at 1351. Appellants' challenge is effectively identical to the challenge the Supreme Court rejected in *Cotton*. A valid indictment was returned by the grand jury. An intervening Supreme Court ruling imposed a new requirement for a conviction under the applicable statute. But, as the Supreme Court held, that new hurdle does not extinguish jurisdiction.

Finally, it is worth noting that the indictment the Supreme Court evaluated in *Rehaif* omitted the mens rea element. Despite an identical lacuna, the Supreme Court vacated the conviction on the merits without addressing subject matter jurisdiction.

27

And jurisdiction is a threshold issue the Supreme Court would have considered. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). Had the defect in *Rehaif*—the same defect we consider here—been jurisdictional, the Supreme Court would have ruled on that ground rather than on the merits.

Appellants also argue that the district court lacked jurisdiction because the indictment failed to track or cite 18 U.S.C. § 924(a)(2). Appellants contend that *Rehaif* holds that 18 U.S.C. § 922(g) is not a criminal offense, and that 18 U.S.C. § 924(a)(2) is the sole operative statute. Based on that contention, Appellants assert that the indictment failed to charge a criminal offense. But that reading misconstrues *Rehaif*. The Supreme Court neither stated nor intimated that 18 U.S.C. § 922(g) is not a criminal prohibition. Indeed, the statute provides that "[i]t shall be *unlawful* for any person" of certain delineated statuses to "possess in or affecting commerce, any firearm or ammunition . . . ." 18 U.S.C. § 922(g) (emphasis added). The language "it shall be unlawful" signals a criminal prohibition. And 18 U.S.C.

§ 924(a)(2) cannot stand alone as the sole criminal offense, because it is confined to stating the penalties for violating 18 U.S.C. § 922(g).

Therefore, while there was a defect in the indictment, it did not deprive the district court of jurisdiction.

### b. Plain Error

Appellants additionally challenge the merits of their conviction in light of *Rehaif*. We review that challenge for plain error. *United States v. Vonn*, 535 U.S. 55, 59 (2002); *United States v. Rahim*, 431 F.3d 753, 756 (11th Cir. 2005) (questions of statutory interpretation raised for the first time on appeal are reviewed for plain error). Appellants must prove that an error occurred that was both plain and that affected their substantial rights. *See United States v. Olano*, 507 U.S. 725, 732 (1993). If they do so, we may, in our discretion, correct the plain error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original) (quotation marks omitted).

We may consult the entire record when considering the effect of an error on appellants' substantial rights. *United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019); *see also Olano*, 507 U.S. at 734 (holding that ordinarily, for a court to correct unpreserved error, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings.").

29

The Government concedes that the indictment was deficient. The law at the time did not require the Government to prove that Appellants were aware that they were felons when they possessed the firearms. And Appellants stipulated—for good reason—that they were felons prior to trial. Appellants' stipulation rendered any evidence the government may have sought to offer regarding their prior convictions inadmissible. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). As such, there is no evidence in the record from which the jury could have found Appellants knew of their felon status at the time they possessed the firearms. Accordingly, the error is plain.

However, it is inconceivable—much less "a reasonable probability"—that Appellants can show "that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quotation marks omitted). Analyzing the probability of an outcome under different circumstances is a challenging endeavor because one has the benefit of hindsight. But the peculiar facts presented here mitigate our burden. Both Appellants previously served lengthy sentences for felony convictions. More notably, both Appellants were previously convicted of violating 18 U.S.C § 922(g), the very statute at issue here. Moore and Miller were sentenced to 92 and 57 months, respectively, for those convictions. Remarkably, Moore even bears a tattoo of the number 92 on his left arm, representing the length of his previous sentence. It is also

30

telling that both Appellants stipulated to their prior felonies, presumably to keep the jury from hearing any details of those convictions. Thus, the record clearly establishes that both Appellants knew they were felons.

*Rehaif* has spawned a slew of challenges in this Circuit. This Court examined a similar issue in *Reed.* 941 F.3d at 1022. There, we rejected Reed's request to set aside his 18 U.S.C. § 922(g) conviction because his eight prior felonies and 18-year sentence "establish[ed] that Reed knew he was a felon [and] he cannot prove that the errors affected his substantial rights or the fairness, integrity, or public reputation of his trial." *Id.* at 1022. The case at hand presents a similar scenario: Appellants cannot establish that they were unaware of their felon status when they possessed firearms due to the nature of their prior felonies. Thus, these errors did not affect Appellants' substantial rights.

### III. CONCLUSION

The district court's decision to shackle Appellants was not plain error. Moreover, the district court did not abuse its discretion in addressing the jury note. With respect to the indictment's omission of the mens rea element for Appellants' 18 U.S.C. § 922(g) charges, we conclude that this error did not deprive the district court of jurisdiction. And the government's failure to prove the now-requisite mens rea element did not constitute a plain error. Finally, upon review of the record, we

conclude that Appellants' remaining arguments are meritless and warrant no discussion.  Accordingly, we affirm the judgments of conviction.

**AFFIRMED.**