[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 19-11687; 19-12887
Non-Argument Calendar
_____

D.C. Docket No. 0:18-cr-60310-BB-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY SPENCER,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(May 7, 2020)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Anthony Spencer appeals his convictions and sentence for conspiracy to commit bank fraud, bank fraud, and possession of a firearm as a felon. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Spencer and his roommate, Dondre Mantack, hatched a scheme to steal money from people's bank accounts. Spencer and Mantack paid bank employees for the account and routing numbers of bank customers. They printed that information onto blank checks, wrote fictitious checks to people who also had accounts at that bank, and deposited the checks into these accounts. They then withdrew the money from those accounts, knowing that the bank would quickly clear the checks because the payer and payee were both account holders at the bank and before the bank even realized what had happened. To launder the proceeds of the fraud, Spencer went to a casino and purchased chips with the stolen money. From July to September 2018, Spencer and Mantack defrauded four banks and six people.

On September 22, 2018, Spencer was arrested. During a search incident to his arrest, officers found five credit cards in his pocket that were not in his name. Later that day, Detective John McKinney, along with other officers, executed a search warrant at the apartment Spencer and Mantack shared together. A search of Mantack's room revealed a computer that was running a program called Check Builder Pro (a check printing program), a credit and debit card re-encoding machine, numerous re-encoded credit cards, and eighteen rounds of .22 caliber bullets. The

2

officers then tried to search Spencer's bedroom, but it was locked.  Because they did not find a key to the room, the officers forced their way in.  In Spencer's room, officers found, among other items, five debit cards (all in names other than Spencer's), blank checks, a CD for a check printing program, and several letters from banking institutions.  Officers also uncovered an unlocked safe containing a .22 caliber loaded revolver and several of Spencer's personal documents.  None of Mantack's possessions were found in Spencer's room.

A month later, Spencer and Mantack were charged with conspiracy to commit bank fraud and bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349, and Spencer was charged with one count of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Spencer pleaded guilty to the conspiracy and bank fraud counts, but he went to trial on the felon-in-possession charge.  Before trial, Spencer stipulated that:

> Prior to and on September 22, 2018, [Spencer] had been convicted in a Florida court of a crime punishable by imprisonment for a term in excess of one year, that is, a felony offense.  Further, [Spencer's] rights to possess a firearm or ammunition have not been, nor were they as of September 22, 2018, restored pursuant to Florida law.  Accordingly, on September 22, 2018, [Spencer] was not lawfully permitted to possess a firearm or ammunition under federal law.

The jury found him guilty.

The probation office prepared a presentence investigation report.  The report added to Spencer's offense level because his offense "involved sophisticated

means," U.S.S.G. § 2B1.1(b)(10)(C), and because he possessed or used "device-making equipment," U.S.S.G. § 2B1.1(b)(11)(A).    Spencer objected to the enhancements.

At the sentence hearing, the district court heard testimony from Detective McKinney, reviewed the presentence investigation report and the other evidence presented at the hearing, and made the following findings.  As to the sophisticated means enhancement, the district court determined that Spencer's crimes were "multilevel and multifaceted."  Spencer, the district court found, went to "great lengths" to evade detection.  The scheme entailed "recruiting co-conspirators who had accounts at the same victim banks, convincing them to provide them with their personal identifying information, . . . depositing those funds into those respective accounts, and . . . withdrawing them prior to the bank realizing the funds."  Such tactical maneuvering, the district court said, was "sophisticated."

As for the device-making enhancement, the district court "believe[d] that the facts fully support[ed] that [the] re-encoder," found in Mantack's room, "was certainly connected to [the] scheme" and that it was "reasonably foreseeable" that the machine was used to further the co-conspirators' fraudulent ends.  The victims "were not local" but, instead, were from "various parts of the United States."  Because many of the victims were out-of-towners, the district court concluded that the debit cards were re-encoded rather than stolen.  The re-encoder machine was

4

"connected" to the fraud, the district court found, because "the checks had to be put into an account with a debit card, and the money pulled out with a debit card."

Because of these two enhancements, Spencer's guideline range was fifty-seven to seventy-one months. The district court sentenced Spencer to seventy-one months' imprisonment. This is Spencer's appeal.

## DISCUSSION

Spencer argues that his conviction must be vacated because (1) in light of the Supreme Court's recent decision in Rehaif v. United States, 139 S. Ct. 2191 (2019), his indictment did not charge, and the government did not prove, that he knew he was a convicted felon at the time he possessed the firearm, and (2) the government did not prove beyond a reasonable doubt that he possessed the firearm. As to his sentence, Spencer argues that the district court erroneously applied the "sophisticated means" and "possession of device-making equipment" enhancements.

### Rehaif Error

In June 2019, five months after Spencer's trial, the Supreme Court in Rehaif held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200. In light of Rehaif, Spencer challenges his indictment

5

and conviction.  We review for plain error.  United States v. Reed, 941 F.3d 1018, 1020 (11th Cir. 2019) (reviewing a new challenge to an indictment and conviction based on Rehaif for plain error).[1]  To prevail, Spencer must demonstrate that "an error occurred that was both plain and that affected his substantial rights."  Id. at 1021.  If he proves this, "we may, in our discretion, correct the plain error if it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"  Id. (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).  When conducting plain error review, we "may consult the whole record when considering the effect of any error on [Spencer]'s substantial rights."  Id. (quoting United States v. Vonn, 535 U.S. 55, 59 (2002)).

Rehaif requires the government to charge in the indictment and prove at trial that the defendant knew he belonged to the categories of persons barred from possessing a firearm.  The government did not.  Rehaif made this error plain.  Reed, 941 F.3d at 1021; see also United States v. Moore, 954 F.3d 1322, 1337 (11th Cir. 2020).  But while there was plain error, Spencer cannot meet the substantial-rights prong of the plain error test because he cannot "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different."  Molina-

---

[1] In an attempt to avoid plain error review, Spencer argues that because his indictment failed to allege his knowledge of his felon status, it failed to allege a crime, stripping the district court of jurisdiction.  We rejected that argument in United States v. Moore, 954 F.3d 1322 (11th Cir. 2020).  See id. at 1336 (noting that a Rehaif error is a non-jurisdictional issue because "the omission of an element in an indictment does not deprive the district court of subject matter jurisdiction").

Martinez v. United States, 136 S. Ct. 1338, 1343 (2016) (internal quotation marks omitted).

Since Rehaif, this court has twice addressed the issue on direct appeal. In Reed, we concluded that the defendant could not show that the outcome of his trial would have been different because: (1) "he had been convicted of eight felony convictions in a Florida court"; (2) he had previously "served a minimum of 18 years in prison before being arrested for possessing the firearm"; and (3) he stipulated and testified that "he knew he was not supposed to have a gun." 941 F.3d at 1021–22 (emphasis removed).

In Moore, we arrived at the same conclusion because the defendants: (1) "previously served lengthy sentences for felony convictions"; (2) were previously convicted of violating § 922(g); and (3) "stipulated to their prior felonies." 954 F.3d at 1337–38. Indeed, in Moore, we compared the facts of Reed and stated that, given the nature of the prior felonies in both cases, the defendants could not claim to be unaware of their felon status when they possessed the firearms. Id. at 1338. Neither can Spencer.

When he possessed the firearm, Spencer had previously been convicted of six felonies. For his most recent convictions, he served twenty-seven months in prison and was released in September 2017 on supervised release. Spencer was on supervised released when he committed these current felonies. Before trial, Spencer

stipulated that prior to and on the date of his arrest "[he] had been convicted in a Florida court of . . . a felony offense" and "[he] was not lawfully permitted to possess a firearm or ammunition under federal law." Based on the record, Spencer has not met his burden to show that his substantial rights were affected by the plain error.

*Sufficiency of the Evidence as to Possession*

Spencer next contends that there was insufficient evidence to convict him under § 922(g) because the government did not prove that he possessed the .22 caliber loaded gun. As support, he points to the lack of evidence of actual possession, the time that elapsed between the police knock and entry of the apartment, Mantack's refusal to open the door, and the matching .22 caliber ammunition found in Mantack's room.

We review the sufficiency of the evidence de novo, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict." United States v. Schier, 438 F.3d 1104, 1107 (11th Cir. 2006). "We will not vacate a conviction on sufficiency of the evidence grounds when a defendant does nothing more than 'put forth a reasonable hypothesis of innocence,' because 'the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'" United States v. Campo, 840 F.3d 1249, 1258 (11th Cir. 2016) (quoting United States v. Beckles, 565 F.3d 832, 840–41 (11th Cir. 2009)). To prove possession under section 922(g),

8

the government must show that the defendant knowingly possessed a firearm at the time of his arrest. The government may do so by demonstrating actual or constructive possession. See United States v. Howard, 742 F.3d 1334, 1341 (11th Cir. 2014).

This is a constructive possession case. To prove constructive possession, the government had to show that "the defendant exercised ownership, dominion, or control over the firearm, or that he had the power and intent to exercise dominion or control over it." Howard, 742 F.3d at 1341. That evidence may come in the form of "direct or circumstantial evidence." United States v. Greer, 440 F.3d 1267, 1271 (11th Cir. 2006).

The government provided sufficient evidence that Spencer constructively possessed the firearm. When the officers raided the apartment, Spencer's door was locked. Detective McKinney asked Mantack for a key to the room, but Mantack said he did not have one. Mantack said he did not have access to the room because Spencer always locked his room when he left. The officers "forced [their way] into [Spencer's] room." Rummaging through the room, the officers noticed an open safe. Inside the safe was a loaded .22 caliber revolver laying on top of "several of . . . Spencer's personal documents, . . . includ[ing] his birth certificate and Social Security card, several pieces of mail addressed to him, [and] a couple of blank checks." Spencer's argument—that Mantack could have placed the firearm in his

room—is merely a reasonable hypothesis of innocence that does not address the sufficiency issue of whether a jury reasonably could have found guilt beyond a reasonable doubt. See Campo, 840 F.3d at 1258. Here, the jury heard sufficient evidence that Spencer constructively possessed the firearm because he had dominion and control over the bedroom and safe. See United States v. Ochoa, 941 F.3d 1074, 1105 (11th Cir. 2019) (concluding that "the jury was presented with sufficient evidence" that the defendant constructively possessed ammunition found in his bedroom, in violation of § 922(g)(1), where "[t]he government tied [the defendant] to the bedroom through his phones (one of which had on it a photo of [the defendant] laying on the bed in the bedroom), personal identification cards, and travel papers bearing his name—all of which were found in the same bedroom as the ammunition"); see also United States v. Molina, 443 F.3d 824, 830 (11th Cir. 2006) (determining that there was sufficient evidence that the defendant constructively possessed the firearm "[b]ecause the firearm was found in [the defendant's] bedroom, in the drawer of the nightstand that also contained . . . her passport . . . , [so] a reasonable jury could have found that [she] exerted ownership, dominion, or control over the firearm" (internal quotation marks omitted)).

*Sentencing Issues*

Spencer contends the district court erred by applying the sophisticated means enhancement and the device-making equipment enhancement to his guideline

calculation. Having reviewed the district court's findings for clear error, United States v. Barrington, 648 F.3d 1178, 1199 (11th Cir. 2011) (sophisticated means enhancement); United States v. Cruz, 713 F.3d 600, 605 (11th Cir. 2013) (device-making equipment enhancement), we conclude that the district court did not clearly err in applying the two sentencing enhancements.

## 1. Sophisticated Means Enhancement

Spencer argues his bank fraud was not sophisticated but typical of other bank frauds in that it was "simple." Specifically, he contends that the crimes did not have many victims and co-conspirators, affect multiple jurisdictions, generate a huge loss, or span over several years. Nor did he hide assets, transactions, or proceeds in offshore accounts or shell corporations. Spencer did not launder stolen funds at a casino; he simply spent the money gambling.

Under section 2B1.1(b)(10)(C), a defendant receives a two-level enhancement to his offense level if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." "'Sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. comment. n. 9(B). Facts indicative of sophisticated means listed in the commentary include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." Id.; see also United States v.

11

Clarke, 562 F.3d 1158, 1165 (11th Cir. 2009) (noting that the applicability of the sophisticated means enhancement is not limited to the examples listed in § 2B1.1(b)(10)(C)'s commentary).  In 2015, section 2B1.1(b)(10)(C) was amended to direct courts to focus less on whether the overall scheme was sophisticated and "more on the individual's own conduct to determine whether the offense involved sophisticated means."  United States v. Presendieu, 880 F.3d 1228, 1244 (11th Cir. 2018).  "[R]epetitive, coordinated conduct designed to allow [a defendant] to execute his fraud and evade detection" may qualify as sophisticated.  United States v. Bane, 720 F.3d 818, 827 (11th Cir. 2013).

Spencer and Mantack paid five bank employees for information related to the account and routing numbers of legitimate account holders at each respective bank, printed this information onto fictitious and fraudulent checks, and deposited the checks.  Spencer and Mantack chose payees with accounts at the same banks as the stolen accounts because they knew that the bank would quickly clear the funds before the bank even realized what had happened.

Spencer and Mantack's overall scheme also entailed using, or intending to use, re-encoded cards.  That is, they would obtain someone else's debit or credit card numbers, re-encode that stolen information onto access devices, and use the re-encoded access devices to conduct transactions.  In total, officers recovered sixty-five "unauthorized" or "counterfeit" access devices.

12

Spencer and Mantack, to further elude discovery of the fraud, would go to different bank locations to withdraw cash.  On one day, for example, Mantack traveled to "three different Citibank locations" to spread out the cash withdrawals. See also United States v. Campbell, 491 F.3d 1306, 1315 (11th Cir. 2007) (determining that the district court was reasonable "to conclude that [the defendant] engaged in his 'unusual spending patterns' to conceal his fraud on the government"). To conceal the proceeds of the fraud, Spencer laundered money at a casino. Although not an offshore account or a shell corporation, Spencer's laundering of the money at a casino is still concealment of the ill-gotten gains.  See United States v. Feaster, 798 F.3d 1374, 1381 (11th Cir. 2015) ("[O]ur caselaw demonstrates that we have sustained application of the sophisticated-means enhancement where defendants have engaged in concealment of their crimes in a variety of ways not expressly stated in the Application Note.").

This was not a simple rip-off or check kiting scheme.  Spencer had several people work for him, his fraud contained multiple steps including computer-created checks and debit cards, and he hid how and where he obtained and concealed the money so he would not get caught.  The district court did not clearly err in finding that Spencer used sophisticated means to commit his fraud.

## 2. Device-Making Equipment Enhancement

Under section 2B1.1(b)(11)(A)(i), a district court may increase, by two levels, a defendant's offense level "[i]f the offense involved . . . the possession or use of any . . . device-making equipment." Spencer, conceding that the re-encoder machine found in Mantack's room was device-making equipment, argues that there was no evidence that "he used the re-encoder machine, or even knew that it was used." Spencer contends that Mantack's possession and use of the re-encoder machine was not part of the fraud scheme. Rather, the fraud scheme, Spencer says, was achieved either by using stolen debit cards or the co-conspirator bank employees' "own debit cards."

Under the sentencing guidelines, the device-making equipment enhancement applies to Spencer if he used the re-encoder machine himself to commit the fraud, or if one was used "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). The district court did not clearly err in finding that all three elements were met.

As the district court explained, using re-encoded debit cards was within the scope of, and in furtherance of, Spencer and Mantack's bank fraud scheme. The duo would use co-conspirator bank employees to steal account information from bank customers. Then, using computer programs and equipment, they would create fake

14

checks drawn on those stolen account numbers. Spencer and Mantack would deposit the fake checks in other stolen accounts at the same bank and then use re-encoded debit cards to withdraw cash from ATMs around South Florida. Spencer had some of these re-encoded debit cards on him when he was arrested and there were more found in his bedroom. The re-encoded debit cards were a critical part of Spencer's fraud scheme.

As to whether it was reasonably foreseeable that the re-encoder machine found by law enforcement was used in connection with the bank fraud scheme, Mantack had the re-encoder machine in his shared apartment with Spencer and next door to Spencer's bedroom. In the same shared apartment, law enforcement also found more re-encoded credit cards and the computer program that was used to make the fake checks—the tools of Spencer and Mantack's fraud scheme. Spencer used re-encoded credit cards to withdraw money from the stolen bank accounts and had the cards on him when he was arrested and more in his bedroom. The cards had to have been re-encoded from somewhere and no other re-encoder machine was found. Given these facts, the district court did not clearly err in finding it reasonably foreseeable that the re-encoded cards Spencer used came from the only re-encoder machine found in this case—the one found in Spencer's apartment and in the same room with other re-encoded credit cards and the computer program used to make the fake checks. See United States v. Cruz, 713 F.3d 600, 607–08 (11th Cir. 2013)

15

(determining that the district court did not clearly err in imposing the device-making equipment enhancement to a defendant whose co-conspirator possessed and used the equipment because there was evidence that she knew about her co-consiprator's use of the equipment, she lived at the same address as the co-conspirator, and she used the re-encoded cards).

**AFFIRMED.**