[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 20-14264

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SEBASTIAN AHMED,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60200-FAM-2

————————————————

Before ROSENBAUM, BRANCH, and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

A jury convicted Sebastian Ahmed of healthcare fraud, wire fraud, and money laundering in a trial that took place during the initial days of the coronavirus pandemic. Ahmed appeals his conviction, raising a number of constitutional, evidentiary, and procedural challenges. Ahmed argues that he was deprived of his Fifth and Sixth Amendment rights because, among other things, his lawyer, fearing coronavirus exposure, refused to visit him in jail throughout the trial. He also posits that the government committed prosecutorial misconduct by improperly questioning one of his witnesses. On top of all that, Ahmed contends that the district court abused its discretion and violated his right to present a defense by making erroneous evidentiary rulings. Ahmed believes the district court's cumulative errors denied him a fundamentally fair trial. We disagree and affirm.

## I.

We start with the facts of the case. Ahmed's conviction stems from his ownership of two substance abuse treatment centers, Jacob's Well and Medi MD, LLC. Ahmed also operated multiple residential sober homes—collectively known as Serenity Ranch Recovery or Serenity Treatment Centers—intended to provide safe, drug-free residences for Jacob's Well and Medi MD patients.

Ahmed and his co-defendants concocted a scheme for Serenity to submit insurance claims for substance abuse treatment services never rendered. Serenity would recruit young patients using

gimmicks like free flights, phones, vapes, and cigarettes. After en-rolling patients, Serenity would provide shoddy treatment services, doling out drugs in plastic baggies and allowing behavior health technicians to engage in sexual relationships with the patients. Living conditions at Serenity deteriorated into squalor, and several patients overdosed. Between July 2016 and July 2019, Serenity submitted over $37,000,000 in fraudulent claims to insurance companies, eventually receiving more than $6,000,000.

The government charged Ahmed with conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. § 1349; ten counts of healthcare fraud, in violation of 18 U.S.C. § 1347; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956; and eleven counts of money laundering, in violation of 18 U.S.C. § 1957. Ahmed's trial commenced in February 2020 and continued through the first days of the coronavirus pandemic, ending in late-March 2020.

Central to this appeal, Ahmed's counsel orally moved for a mistrial a couple of weeks into the trial, expressing concern that the emerging coronavirus would impact the jury and prevent him from visiting Ahmed in jail. The district court denied the motion. Ahmed's counsel renewed the motion for mistrial twice more, echoing his previous concerns. The district court denied the motions. At the close of evidence, the jury unanimously voted to deliberate, despite the evolving coronavirus situation.

Ahmed raised a slew of other concerns during the trial. A few days into the trial, the district court learned that the jail was

not providing Ahmed with his prescribed Adderall. After an *in camera* competency hearing, the district court found Ahmed responsive enough to proceed. Still, the district court took steps to ensure Ahmed received his medication, such as allowing him to take it at the beginning of court each day and reminding the jail to give it to him on the weekend. Ahmed also expressed concern about injuries sustained in a slip-and-fall accident at the jail, shackles cutting into his ankles during the trial, and the jail's confiscation of his legal materials.

A few other issues relevant to this appeal arose as well. One related to the government's characterization of Florida law during cross-examination of one of Ahmed's witnesses. The others involved the district court's exclusion of certain documentary and testimonial evidence.

After a twenty-five-day trial, a jury convicted Ahmed of one count of conspiracy to commit healthcare fraud and wire fraud, five counts of healthcare fraud, one count of conspiracy to commit money laundering, and eleven counts of money laundering. The district court sentenced Ahmed to 210 months' imprisonment. Ahmed timely appealed.

## II.

This appeal turns on several standards of review. We review claims of constitutional error at a criminal trial *de novo*. *United States v. Cavallo*, 790 F.3d 1202, 1213 (11th Cir. 2015).

If a criminal defendant does not object to a district court's shackling determination, we review for plain error. *United States v. Moore*, 954 F.3d 1322, 1329 (11th Cir. 2020). Plain error requires "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (quoting *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005). And we may notice the error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *Baker*, 432 F.3d at 1203).

We uphold a district court's decision not to grant a mistrial unless we detect an abuse of discretion. *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007). A district court should grant a mistrial "if the defendant's substantial rights are prejudicially affected." *Id.*

When a district court allows a witness to invoke the Fifth Amendment right against self-incrimination, we review its decision for abuse of discretion. *United States v. Perez*, 661 F.3d 568, 580 (11th Cir. 2011). We usually review a district court's evidentiary rulings for abuse of discretion too. *United States v. Todd*, 108 F.3d 1329, 1331 (11th Cir. 1997).

### III.

Ahmed raises three groups of issues on appeal. First, he argues that the coronavirus pandemic impacted his ability to communicate with counsel, meaningfully participate at trial, and confront the witnesses against him. He believes the district court's refusal to grant a mistrial on those grounds violated his Fifth and Sixth Amendment rights. Second, he contends the government

committed prosecutorial misconduct by alleging that one of his witnesses violated Florida prescription drug law. The district court allowed the testimony and later found that any mischaracterizations of Florida law by the government did not seriously undermine Ahmed's defense. Third, Ahmed posits that the district court committed several evidentiary errors, depriving him of his ability to present a defense. These cumulative errors, he argues, denied him a fundamentally fair trial. We address each group of issues in turn.

*A.*

We start with the coronavirus. Ahmed argues that the emerging coronavirus pandemic pervaded his trial and deprived him of his Fifth and Sixth Amendment rights. Specifically, he contends that he could not meaningfully participate in his defense, confront witnesses against him, or benefit from effective assistance of counsel because of several incidents that transpired during trial. He believes the district court should have granted his many motions for a mistrial. We disagree.

1.

Ahmed's lawyer, supposedly fearing coronavirus infection, said on the record during trial that he would not visit his client in jail during overnight recess. Ahmed argues that this refusal deprived him of his Sixth Amendment right to counsel under *Geders v. United States*, 425 U.S. 80 (1976), because he could not effectively communicate with his lawyer. We disagree.

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Applying the Sixth Amendment in *Geders*, the Supreme Court held that a court cannot preclude defense counsel from communicating with a defendant "about anything" during an overnight recess. 425 U.S. at 91. The Supreme Court has recognized that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). But the Court has observed that overnight "recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed." *Geders*, 425 U.S. at 88. The overnight recess period "gives the defendant a chance to discuss with counsel the significance of the day's events." *Id.* Thus, a court order prohibiting a defendant from consulting counsel "about anything" during an overnight recess conflicts with the Sixth Amendment. *Id.* at 91.

For our part, we have held that a court must provide a defendant with a "reasonable opportunity" to communicate with counsel. *United States v. Vasquez*, 732 F.2d 846, 848 (11th Cir. 1984). That is, "a court may not deny a defendant *all opportunity* to consult counsel." *Id.* (emphasis added). A *Geders* violation "presum[es] prejudice" when "an unconstitutional statute or court order" hinders "a defense attorney . . . [from] rendering assistance of counsel to his client." *United States v. Roy*, 855 F.3d 1133, 1148 (11th Cir. 2017) (en banc). Still, "a criminal defendant must demonstrate that he

and his counsel actually intended to confer during the recess and would have done so" but for an interference by the court, government, or criminal justice system. *United States v. Nelson*, 884 F.3d 1103, 1109 (11th Cir. 2018).

Ahmed argues that a *Geders* violation occurred because his attorney refused to visit him in jail due to coronavirus fears. Not so. To secure a reversal under *Geders*, Ahmed must establish that the government or a court—not his own lawyer—deprived him of the opportunity to communicate. *See Roy*, 855 F.3d at 1148. But neither the government nor the court nor the criminal justice system prohibited overnight communication. Instead, Ahmed's lawyer informed the district court that, out of concern for *his own* health, he would not meet with Ahmed at the jail during the overnight recess. Moreover, there is no evidence on this record that Ahmed's lawyer "actually intended to confer" with his client during the overnight recess, irrespective of the pandemic concerns. *See Nelson*, 884 F.3d at 1109. For instance, Ahmed's lawyer also told the district court that he did not have time to visit the jail.

Finally, we note that the district court went to great lengths to facilitate communication between Ahmed and his lawyer. It allowed them to communicate in writing during the trial and while Ahmed was incarcerated at the county jail. And nothing precluded Ahmed's lawyer from attempting to communicate electronically or via telephone with his client. Ahmed's lawyer even acknowledged that he was able to consult with Ahmed during the overnight recess period once, though he did not specify how he did so.

The district court did not deny Ahmed "all opportunity to consult counsel" and provided him with a "reasonable opportunity" to strategize with his lawyer. *See Vasquez*, 732 F.2d at 848. The communication deficiencies about which Ahmed complains resulted from his lawyer's caprice, not from the court, government, or criminal justice system. Accordingly, no *Geders* violation occurred.

2.

As an alternative to his *Geders* claim, Ahmed argues that his lawyer's failure to communicate with him (among other things) amounted to ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 686 (1984). That claim is not properly before us.

The right to counsel means "the right to the *effective* assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)) (emphasis added). But a defendant usually cannot claim ineffective assistance of counsel for the first time on direct appeal without a sufficiently developed record. *See United States v. Griffin*, 699 F.2d 1102, 1107–09 (11th Cir. 1983); *accord United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002) (holding that we generally do not consider ineffective-assistance-of-counsel claims on direct appeal "where the district court did not entertain the claim nor develop a factual record"). Though an insufficient record may bar direct appeal, a defendant may challenge the effectiveness of counsel in a federal habeas corpus proceeding, where the district court may grant an evidentiary hearing

to develop the record. *See Griffin*, 699 F.2d at 1109 (citing 28 U.S.C. § 2255).

Ahmed never raised ineffective assistance of counsel at the district court. He advances the argument for the first time on appeal, but there is no record to support his claims. Although Ahmed's lawyer made statements on the record about communication, these statements were not made under oath, they were not subject to cross-examination, and there is no way to assess whether any communication difficulty prejudiced Ahmed's defense. Because there is no relevant record from the district court related to this challenge, we cannot consider the merits of Ahmed's claim on direct appeal. *See id.* at 1107–09.

Citing *United States v. Rodriguez*, Ahmed contends that an exception applies to our presumption against direct appeal for ineffective assistance claims when the case involves a conflict of interest. 982 F.2d 474 (11th Cir. 1993). According to Ahmed, an irreconcilable conflict doomed his case because his lawyer had to choose between zealous advocacy for his client and protecting his own health. We need not plumb the merits of that contention because Ahmed misreads *Rodriguez*. In *Rodriguez*, we rejected two defendants' claims that joint representation created a conflict of interest and violated their right to effective counsel. *Id.* at 476–78. We reached that conclusion based on the transcript from the pretrial hearing at which both defendants consented to joint representation. *Id.* at 475–77. In other words, the record from the district court was sufficiently developed to review the defendants' direct

appeal. *Cf. Griffin*, 699 F.2d at 1107–09; *Bender*, 290 F.3d at 1284. Notably, we declined to address another conflict-of-interest issue that the defendants failed to raise at the district court because it was not "developed factually." *Rodriguez*, 982 F.2d at 476 n.3.

Ahmed cannot direct us to any developed portion of the record that would allow us to review the merits of his ineffective assistance claim. Thus, without prejudice to a future Section 2255 petition, the claim is not properly before us, and we refuse to consider it.

3.

Finally, Ahmed raises a panoply of miscellaneous complaints—lack of Adderall, slip-and-fall injuries, confiscated legal materials, tight shackles, and an unengaged jury—that he believes compounded the district court's supposed error in denying a coronavirus-based mistrial. These complaints lack merit. We will address each in turn.

The Fifth Amendment's "Due Process Clause guarantees a defendant's 'right to be present at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure.'" *United States v. Brown*, 879 F.3d 1231, 1236 (11th Cir. 2018) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). The right to be present includes the right to confront witnesses too. *See* U.S. Const. amend. VI; *United States v. Gagnon*, 470 U.S. 522, 526 (1985). A defendant's Sixth Amendment right to confront witnesses ordinarily applies during

the government's case-in-chief, whereas the Fifth Amendment supplements that right with a broader protection for a defendant's presence at all critical stages of the criminal proceeding. *See United States v. Novaton*, 271 F.3d 968, 997–98 (11th Cir. 2001) (tracing the root of a criminal defendant's right to be present to the Sixth Amendment's Confrontation Clause, the Fifth Amendment's Due Process Clause, and Rule 43 of the Federal Rules of Criminal Procedure).

First, Ahmed argues that he could not meaningfully participate in his defense or confer with counsel because the jail would not administer his prescribed Adderall. Ahmed claims that he did not receive his medication until the seventh day after trial commenced and never received it on the four weekends during the trial.

Ahmed's intermittent access to Adderall did not violate his Fifth or Sixth Amendment rights. As soon as the district court learned that Ahmed was not receiving his medication, it took several steps to remedy the situation. For starters, the district court held an *in camera* competency hearing, finding that Ahmed was responsive despite his lack of Adderall. Still, the district court asked marshals to administer Ahmed's Adderall at the jail, allowed Ahmed to take his medication at the beginning of court each day, and personally contacted the jail about the issue.

Ahmed argues that the Supreme Court's holding in *Riggins v. Nevada* supports his argument. 504 U.S. 127 (1992). But Ahmed's case is not like *Riggins*. In *Riggins*, the Supreme Court held that a

defendant cannot receive a full and fair trial when *forced* to take an antipsychotic drug. *Id.* at 133–38. Here, the opposite occurred. Ahmed requested the Adderall—the district court acquiesced and rectified his inability to access it, so no Fifth or Sixth Amendment violation occurred.

Second, Ahmed asserts that he sustained injuries to his back, shoulder, and wrist after a slip-and-fall accident at the jail. He asserts that the jail failed to treat him, which hindered his ability to focus at trial, participate in his defense, and consult his lawyer. After Ahmed's lawyer alerted the district court to these injuries, the district court, via the marshal service, instructed the jail to conduct a medical examination of Ahmed. A healthcare provider examined Ahmed shortly thereafter. Nothing in the record suggests that Ahmed's injuries impacted his ability to concentrate, participate in his defense, or communicate with his lawyer. Again, no constitutional violation occurred.

Third, Ahmed contends that the jail confiscated his highlighted legal materials, which impeded his ability to participate in his defense and violated his due process right to be apprised of the evidence against him. But Ahmed's lawyer told the district court that he—not Ahmed—annotated those materials. And Ahmed could still review his lawyer's copy of those materials during trial. The district court even dispatched marshals to retrieve the confiscated documents immediately upon learning of the seizure. This argument is meritless.

Fourth, Ahmed argues that his shackling at trial interfered with his ability to confer with his lawyer and participate in his defense. Ahmed separately posits that the district court abused its discretion by allowing him to remain shackled, entitling him to a new trial.

Shackles "may confuse the defendant, impair his ability to confer with counsel, and significantly affect the trial strategy he chooses to follow." *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223 (11th Cir. 1983); *accord Deck v. Missouri*, 544 U.S. 622, 631–32 (2005). Restraints, if visible, may prejudice the jury. *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002). We grant a district court "reasonable discretion to decide whether to shackle or otherwise restrain the defendant." *Zygadlo*, 720 F.2d at 1223. Ordinarily, "the record should reflect why restraints are necessary." *Moore*, 954 F.3d at 1330.

Ahmed concedes that he did not object to his shackling at the district court, so we review for plain error. *Id.* at 1329. Plain error requires Ahmed to establish (1) error that is (2) plain and (3) impacted his substantial rights. *See id.* Even if Ahmed establishes all three conditions, the forfeited error must have "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings" for us to notice it. *Id.* (quoting *Baker*, 432 F.3d at 1203).

Ahmed's shackles were not visible to the jury during trial, and the district court had them removed before Ahmed testified. Though the district court did not memorialize on the record its reasons for shackling Ahmed, it did not plainly err because the jury

never saw the restraints. *See id.* at 1329–30 (holding that the district court did not plainly err by restraining the defendant without stating its reasoning on the record mainly because *nonvisible* shackles did not affect the defendant's substantial rights). In this sense, even if the district court should not have restrained Ahmed during the trial, the shackling did not affect Ahmed's substantial rights—such as the presumption of innocence—or prejudice the jury because the shackles were never visible. Nor did it impact his decision to testify. To be sure, Ahmed says that the shackles hurt his ankles when he was not wearing socks. But nothing in the record indicates that this transient discomfort prevented him from communicating with his lawyer or participating in his defense. Accordingly, the decision to restrain Ahmed with nonvisible restraints during trial was not plain error.

In a final salvo, Ahmed speculates that the jury could not devote adequate attention to the proceedings because of anxiety related to the coronavirus pandemic. Here too, the record belies Ahmed's contention. In response to Ahmed's concerns about continuing the trial in March of 2020, the district court asked the jurors whether the evolving coronavirus situation would prevent them from focusing on the evidence or properly applying the law. No juror voiced concern. And at the close of evidence, the jury unanimously voted to proceed with deliberations. There is no reason to believe that the jury was anything but attentive and engaged throughout the trial.

In short, we cannot say the district court abused its discretion in denying Ahmed's motions for a mistrial. On the contrary, we commend the district court for its wise, efficient, and patient administration of justice during the early days of the pandemic.

*B.*

Ahmed next argues that the government committed prosecutorial misconduct. Ahmed's prosecutorial misconduct claim requires him to establish that the prosecution (1) made an improper statement that (2) affected his substantial rights. *United States v. Cooper*, 926 F.3d 718, 739 (11th Cir. 2019). He says the government misrepresented Florida law during its questioning of defense witness Kay Stevens, which suggested that she illegally prescribed psychotropic medication at Serenity. According to Ahmed, this insinuation of illegality rebutted his defense that he hired competent medical staff to run Serenity, undermined the legitimacy of his operation, and denied him a fundamentally fair trial. Again, we disagree.

Under Florida law, advanced practice registered nurses, like Stevens, may perform certain acts within their specialty. Fla. Stat. § 464.012(4). Relevant here, "psychiatric nurse[s] . . . may prescribe psychotropic controlled substances for the treatment of mental disorders." *Id.* § 464.012(4)(e). Moreover, the state's regulatory board must "establish a committee to recommend a formulary of controlled substances that an advanced practice registered nurse may not prescribe or may prescribe only for specific uses or in limited quantities." *Id.* § 464.012(6)(a). That committee "may recommend

20-14264                Opinion of the Court                17

an evidence-based formulary applicable to all advanced practice registered nurses which is limited by specialty certification . . . or is subject to other similar restrictions." *Id.* That formulary "must restrict the prescribing of psychiatric mental health controlled substances for children younger than 18 . . . to advanced practice registered nurses who also are psychiatric nurses." *Id.* It "must also limit the prescribing of Schedule II controlled substances . . . to a 7-day supply," but that limitation "does not apply to controlled substances that are psychiatric medications prescribed by psychiatric nurses." *Id.* A psychiatric nurse "means an advanced practice registered nurse . . . who has a master's or doctoral degree in psychiatric nursing, holds a national advanced practice certification as a psychiatric mental advanced practice nurse, and has 2 years of postmaster's clinical experience under the supervision of a physician." *Id.* § 394.455(36).

During cross-examination, Stevens testified that she prescribed antipsychotics, like Seroquel and Subutex, and benzodiazepines to Serenity patients. The government asked Stevens whether she was aware that only psychiatric nurses could prescribe such drugs under Florida law. Stevens responded that the government misunderstood Florida's limitations on nurse practitioners and that she was authorized to prescribe the medications at issue. The government reprised this point about Stevens's alleged lack of prescription authority during its cross-examination of Ahmed and closing argument. Ahmed argues that this line of questioning amounted to prosecutorial misconduct because the government misinterpreted Florida law and erroneously accused Stevens of illegality.

After trial, the district court concluded that the government had been wrong about Florida law but that the error was harmless. We need not probe the soundness of the district court's interpretation of Florida law because we agree that any error was harmless and did not prejudice Ahmed's substantial rights. *See Cooper*, 926 F.3d at 739.

Ahmed's defense did not hinge on Stevens's prescription practices or whether they complied with Florida law. Instead, the crux of his defense was that, as a passive investor, he relied on the expertise of his medical team and other employees to operate Serenity lawfully. The government undermined his defense by eliciting testimony from several witnesses that Ahmed called the shots at Serenity. Any intimation that a single advanced practice registered nurse may have prescribed psychotropic drugs without authorization had little bearing on whether Ahmed and his co-conspirators committed healthcare fraud. Moreover, Stevens responded to the government's questions by denying that her prescription practices violated Florida law, explaining to the jury that the government's lawyer misunderstood Florida's limitations on nurse practitioners. Even if the government improperly cross-examined Stevens, the government's statements did not prejudice Ahmed's substantial rights. Accordingly, Ahmed's prosecutorial misconduct claim fails.

## C.

Ahmed posits that three evidentiary rulings by the district court deprived him of his right to present a defense. These rulings

concern the district court's exclusion of testimony by Ahmed's expert, certain documentary evidence, and testimony by Ahmed's former attorney. Once again, we disagree that the district court erred.

"The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v. Nunez*, 1 F.4th 976, 991 (11th Cir. 2021). But that right remains "subject to reasonable restrictions." *Id.* (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). Still, "[a]n evidentiary ruling may violate the right if it 'infringe[s] upon a weighty interest of the accused.'" *Id.* (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)) (second alteration in original). A district court "does not infringe a weighty interest" by excluding testimony that "only 'would have been helpful.'" *Id.* (quoting *United States v. Gillis*, 938 F.3d 1181, 1195 (11th Cir. 2019)). Nor does the district court's exclusion of cumulative evidence violate the right to present a complete defense. *See id.* at 991–92. The Supreme Court has never held that application of "a federal rule of evidence violated a defendant's right to present a complete defense." *United States v. Mitrovic*, 890 F.3d 1217, 1222 (11th Cir. 2018).

We generally review a district court's evidentiary ruling for abuse of discretion. *Todd*, 108 F.3d at 1331. If "a party failed to object to an evidentiary ruling at trial," however, we conduct a plain-error review. *United States v. Clotaire*, 963 F.3d 1288, 1292 (11th Cir. 2020). A district court's interpretation of the Federal Rules of Evidence receives *de novo* review. *Doe No. 1 v. United States*, 749 F.3d

999, 1003 (11th Cir. 2014). Even if the district court makes an incorrect evidentiary ruling, we will not reverse harmless error. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); *see also* Fed. R. Evid. 103(a) (stating that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party").

1.

Ahmed argues that the district court erred by excluding the testimony of his expert, Lilliam Rodriguez, who invoked her Fifth Amendment right against self-incrimination. Ahmed sought to call Rodriguez to establish industry practice on a clinical director's duties to safeguard medical records and to sign off on completed treatment services. Rodriguez invoked her Fifth Amendment privilege when questioned outside the presence of the jury about her past employment as clinical director of Holistic Recovery Services. After the proffer, the district court decided to exclude her testimony entirely. Because her expert qualifications were directly tied to her experience at Holistic, the district court concluded that her invocation of the privilege prevented the government from vetting those qualifications and challenging her credibility.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A witness properly invokes this privilege when "reasonably apprehend[ing] a risk of self-incrimination," even if the prosecution risk "is remote." *United States v. Cuthel*, 903 F.2d 1381, 1384 (11th Cir. 1990) (quoting *In re Corrugated Container*

*Anti-Trust Litig.*, 620 F.2d 1086, 1091 (5th Cir. 1980)). "[W]e do not require a high showing to meet this reasonable cause standard." *Perez*, 661 F.3d at 580. Generally, we resolve a conflict between a witness's Fifth Amendment privilege and a defendant's Sixth Amendment compulsory process right in favor of the witness. *Cuthel*, 903 F.2d at 1384. A district court needs to "make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded." *United States v. Argomaniz*, 925 F.2d 1349, 1355 (11th Cir. 1991) (quoting *United States v. Melchor Moreno*, 536 F.2d 1042, 1049 (5th Cir. 1976)).

Ahmed contends that (1) the district court did not conduct a particularized inquiry into the legitimacy and scope of the invoked privilege, (2) Rodriguez did not face a real and substantial risk of self-incrimination, and (3) the scope of the privilege honored by the district court was too broad. Alternatively, Ahmed argues that the district court should have allowed Rodriguez to invoke the privilege but still compelled her to testify. We disagree.

First, the district court conducted a particularized inquiry and properly concluded, after hearing about thirty minutes of proffered testimony, that Rodriguez's basis to invoke her Fifth Amendment privilege was well-founded. *See id.* The district court noted on the record the striking similarities between Holistic's and Serenity's respective business practices. It also explained that answering the government's questions about her employment at Holistic could expose Rodriguez to criminal liability because Holistic's

owner was facing criminal charges for illegally brokering patients. Moreover, Serenity's clinical directors—the same job title held by Rodriguez at Holistic—had already pleaded guilty to conspiring with Ahmed to bill insurance companies illegally.

Second, Ahmed asserts that there was no basis for the district court to conclude that Rodriguez faced a real and reasonable risk of self-incrimination. Ahmed grounds this argument on the government's statements that it did not know the extent of Rodriguez's involvement with the apparently illegal patient brokering at Holistic. Just because the government was unaware of all the details concerning the state's investigation into Holistic does not mean Rodriguez lacked reasonable apprehension of criminal liability. We have never held that a witness may invoke the Fifth Amendment only if the government is already privy to the witness's involvement in the criminal activity at issue. Though no charges were pending against Rodriguez at the time of her proffer, her testimony would have established that she was a clinical director and responsible for the billing practices at Holistic, the owner of which faced serious criminal charges. Her fear of prosecution was far from remote. *Cf. Cuthel*, 903 F.2d at 1384.

Third, Ahmed posits that the district court did not consider the scope of Rodriguez's invocation and ultimately honored too broad a privilege. But Rodriguez did not assert a blanket Fifth Amendment privilege—she limited her invocation to questions about her previous employment at Holistic. In fact, her lawyer clarified that Rodriguez would assert the privilege only with respect to

Holistic, not the other matters in her expert report. Accordingly, Rodriguez appropriately tethered her invocation to a "specific area" of questioning, and the district court did not abuse its discretion by allowing her to plead the Fifth Amendment. *See Argomaniz*, 925 F.2d at 1355; *Perez*, 661 F.3d at 580.

Alternatively, Ahmed argues that, even if the district court correctly honored the privilege, it should have permitted Rodriguez to testify and instructed the jury to consider the invocation when assessing her credibility. Though we review a district court's *Daubert* rulings for abuse of discretion, "we must affirm unless we at least determine that the district court has made a 'clear error of judgment,' or has applied an incorrect legal standard." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005) (quoting *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1306 (11th Cir. 1999) (internal quotation omitted)).

We do not detect "a clear error of judgment" here. *Id.* Under the Federal Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" certain conditions are met. Fed. R. Evid. 702. When a witness relies primarily on experience to form the basis of an expert opinion, "the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment); *see also Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (holding that a trial judge must ensure that all admitted expert testimony "is not only relevant, but reliable"). Admissibility of an expert opinion cannot "be established merely by the ipse dixit of an admittedly qualified expert." *Frazier*, 387 F.3d at 1261.

Rodriguez's unwillingness to answer questions about her work at Holistic denied the district court the ability to assess her expertise and barred the government from challenging her qualifications and probing her credibility. Besides Holistic, Rodriguez worked at two other substance abuse treatment centers, which had the same owner, for a total of three years. Due to Rodriguez's limited work history, her experience at Holistic went to the heart of her qualifications as an expert in medical records and substance abuse treatment centers. But, because Rodriguez invoked her Fifth Amendment right in response to *any* question about Holistic, it was unclear to what extent she based her expert opinions on her work there. The district court applied the correct legal standard and appropriately exercised its discretion to exclude Rodriguez's testimony under Rule 702.

2.

Ahmed challenges the district court's exclusion of certain documentary evidence: invoices, promissory notes, and hardship exemption forms. He argues that these documents are not hearsay, or, if they are, they fall within the business records exception.

The Federal Rules of Evidence define "statement" as "a person's oral assertion, *written* assertion, or nonverbal conduct, if the

person intended it as an assertion." Fed. R. Evid. 801(a) (emphasis added). Under the hearsay rule, statements not made by the declarant "while testifying at the current trial or hearing" that "a party offers in evidence to prove the truth of the matter asserted in the statement" are not admissible, subject to several carveouts and exceptions. *Id.* 801(c)–(d), 802; *see id.* 803–04. Relevant here, business records are excepted from the rule against hearsay if they satisfy certain conditions. *See id.* 803(6). This exception applies to any "record made at or near the time of an act by a person with knowledge if the record 'was kept in the course of regularly conducted activity of a business' and 'making the record was a regular practice of that activity.'" *United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020) (quoting Fed. R. Evid. 803(6)(A)–(C)). The record's proponent may rely on "the testimony of the custodian or another qualified witness" to meet Rule 803(6)'s requirements. *Id.* (quoting Fed. R. Evid. 803(6)(D)). In the end, admissibility under the business records exception boils down to reliability, "and a trial judge has broad discretion to determine the admissibility of such evidence." *Id.* (quoting *United States v. Bueno-Sierra*, 99 F.3d 375, 378–79 (11th Cir. 1996)).

Ahmed sought to admit invoices, promissory notes, and hardship exemption documents at trial. After voir dire examination, the district court concluded that these documents were inadmissible hearsay and sustained the government's objections to them. We assume without deciding that Ahmed adequately preserved these purported errors, so we give him the benefit of abuse-of-discretion review. *See Todd*, 108 F.3d at 1331.

First, Ahmed argues that these documents are not hearsay because he did not offer them to prove their truth but to establish his efforts to bill patients in good faith, rebutting the government's allegations that he provided improper incentives. This argument gains little, if any, traction. To be sure, an out-of-court statement not offered to prove its truth escapes the hearsay prohibition. *Cf.* Fed. R. Evid. 801(c). But using the documentary evidence to support the conclusion that Ahmed properly billed patients presupposes that the information in the documents is *true*. In other words, for the records to benefit Ahmed's defense, the jury would need to believe that the invoices contained appropriate and truthful amounts for services rendered, the promissory notes reflected patients' actual promises to pay Serenity for those services, and the financial hardship documents accurately portrayed patients' need. Accordingly, Ahmed offered these records for their truth.

Second, Ahmed posits that, even if the records are hearsay, Rule 803 allows their admission as business records. This argument has a lot to commend it. Though Ahmed did not recall who exactly created each document, a "testifying witness does not need firsthand knowledge of the contents of the records, of their authors, or even of their preparation." *Curtis v. Perkins (In re Int'l Mgmt. Assocs., LLC)*, 781 F.3d 1262, 1268 (11th Cir. 2015). Nor must the witness know the precise circumstances under which the records were kept as long as enough circumstantial evidence "establish[es] the trustworthiness of the underlying documents." *Id.* Rule 803 does not demand "that the one who kept the record, or even had supervision over [its] preparation, testify." *Id.* at 1269 (quoting

*United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977)) (alteration in original). In this sense, based on the record before us, Ahmed was a "qualifying witness" under Rule 803.

Still, Ahmed testified that he did not know how much time elapsed between rendering services and creating invoices, casting doubt on whether the records were "made at or near the time [of treatment] by . . . someone with knowledge." Fed. R. Evid. 803(6)(A). Ahmed also testified that Serenity's intake protocol included promissory notes and hardship exemption forms, but he lacked specifics on what that protocol entailed. Moreover, when the FBI executed a search warrant at Serenity, the agency found no hardship exemption forms or promissory notes, either in hard copy or electronic form. To be sure, the FBI did not search the transitional living facilities, where Ahmed claims the records were kept, but Ahmed still could not explain how the documents ended up in his lawyer's hands. In this light, the circumstantial evidence indicates that the documents lack the indicia of trustworthiness required by Rule 803. *See id.*; *Curtis*, 781 F.3d at 1268. And because we afford broad discretion to the district court "to determine the admissibility of such evidence," we cannot say the district court abused its discretion by concluding that the invoices, promissory notes, and hardship exemption forms were inadmissible hearsay. *See Frazier*, 387 F.3d at 1259 (holding that, under the abuse-of-discretion standard, "we must affirm unless . . . the district court has made a clear error of judgment, or has applied the wrong legal standard"); *cf. Joseph*, 978 F.3d at 1265 (holding that a district court did not abuse its discretion by admitting business records because

litigant did not show qualified witness's "testimony was otherwise unreliable").

3.

Lastly, Ahmed argues that the district court should have allowed his former attorney, Justin Claud, to testify about Ahmed's response to a deceptive advertising allegation and Ahmed's efforts to ensure zoning compliance. The district court rejected that argument, and so do we.

Rule 404 of the Federal Rules of Evidence prohibits introducing "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). But a defendant in a criminal case may offer evidence of the defendant's "pertinent trait." *Id.* 404(a)(2)(A). Evidence of pertinent traits like honesty and truthfulness are admissible in a fraud case. *United States v. Hough*, 803 F.3d 1181, 1190–91 (11th Cir. 2015). Still, if evidence of a person's character or character trait is admissible under Rule 404, it usually must "be proved by testimony about the person's reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). Specific instances of conduct ordinarily may be used only "[w]hen a person's character or character trait is an essential element of the charge." *Id.* 405(b); *see also* 1 Robert P. Mosteller et al., *McCormick on Evidence* § 187 (8th ed. July 2022 update) (illustrating Rule 405(b) with a defamation example and noting that, "because truth is a defense to defamation claim," a defendant may introduce evidence of a plaintiff's specific acts to prove that the challenged

statement was not defamatory). In other words, "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (quoting *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991)) (alteration in original).

Claud's testimony would have covered specific acts of Ahmed's conduct to establish traits unrelated to the fraud charges. Ahmed would have used this evidence of supposed good conduct "to negate [his] criminal intent," which makes it precisely the kind of evidence that Rules 404(a) and 405(b) prohibit. *See Ellisor*, 522 F.3d at 1270; Fed. R. Evid. 404(a), 405(b). Accordingly, the district court correctly excluded the testimony.

### D.

Ahmed "has not established a single error, let alone the aggregation of many errors." *Joseph*, 978 F.3d at 1265. Thus, his cumulative error claim lacks merit.

### IV.

For these reasons, the district court is **AFFIRMED**.